UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| In re | ) | Chapter 11 |
| | ) | Case No. 01-42217 (REG) |
| AMES DEPARTMENT STORES, INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | | |
| | ) | |
| AMES MERCHANDISING CORPORATION, | ) | |
| | ) | Adversary Proceeding |
| Plaintiff, | ) | No. 03-06261 (REG) |
| vs. | ) | |
| | ) | |
| CELLMARK PAPER INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | | |

DECISION AFTER TRIAL

APPEARANCES:
STORCH AMINI & MUNVES P.C.
*Attorneys for Plaintiff, Ames Merchandising Corp.*
140 East 45th Street
New York, New York  10017
By:    Bijan Amini, Esq. (*argued*)
        Avery Samet, Esq.

PULLMAN & COMLEY, LLC
*Attorneys for Defendant, Cellmark Paper Inc.*
850 Main Street
P.O. Box 7006
Bridgeport, Connecticut  06601
By:    Irve J. Goldman, Esq. (*argued*)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

        In this adversary proceeding under the umbrella of the chapter 11 cases of Ames

Department Stores and affiliates (the "**Debtors**"), Debtor plaintiff Ames Merchandising

Corporation ("**Ames**") seeks to avoid and recover as preferential transfers, pursuant to sections 547 and 550 of the Bankruptcy Code (the "**Code**"), four transfers, made by three checks, to defendant Cellmark Paper, Inc. ("**Cellmark**"), the supplier of paper used by Ames for promotional material. After trial, the Court determines that Cellmark failed to rebut the presumption of insolvency, and failed to establish an ordinary course of business defense. Accordingly, the Court determines that the four transfers were preferential, and an appropriate judgment will be entered in favor of Ames.

Findings of Fact[1]

*1.    Background*

Prior to filing for bankruptcy on August 20, 2001 (the "**Petition Date**"), the Debtors operated over 400 retail stores throughout the northeastern United States. Promotions and advertising were crucial to Ames' business strategy, and Ames attributed over 50% of store revenue to advertised sales. Ames relied on printed circulars to inform customers of these promotions, and the printed circulars would then be inserted into local newspapers or mailed directly to customers. Once a year, in preparation for the fall season, Ames printed a particularly large circular known as the "Home Book" which contained advertising for the fall furniture season. Cellmark was Ames' principal paper supplier for all of these circulars, including the Home Book. Ames was also one of Cellmark's largest customers and top credit exposures.

*A.    Ames and Cellmark's Relationship*

In the three years of the parties' prior dealings, Cellmark issued approximately 300 invoices to Ames.[2] Each of these invoices was generated by Cellmark's computerized invoicing

---

[1]    To shorten this Decision, the Court limits its citations to the most significant matters.

[2]    *See* Merole Affidavit, Ex. A.

system, called Papersoft.[3]  The Papersoft system automatically generated an invoice to Ames once Cellmark received confirmation from its own paper suppliers that the paper had shipped.[4]

Between June 1, 2000, and the beginning of the preference period (the "**Preference Period**")—90 days before the Petition Date—Ames employed an automated accounts payable system created by Oracle to track orders and generate payments to all of its domestic merchandise vendors.[5]  During that same period, Ames paid invoices in full at or around the invoice due date, as its computerized payables system automatically printed checks according to payment due date without regard to the identity of the vendor.[6]  The computer generated checks were routinely mailed to vendors within a day or two of being printed.[7]

### B.    Changes in Ames' Accounts Payable System

In May 2001, as Ames' liquidity was tightening and cash was becoming increasingly tight, Ames executives, including CFO Rolando de Aguiar, began holding regular meetings to decide which vendors should be paid.[8]  The decisions were based on the identity of the vendor and the needs of Ames' business.[9]  For on-account and early payments, Susan Cotter, Ames' Director of Payables, would implement the decision of the group by manually overriding the Oracle computer system and generating a check in the requested amount.[10]  By August 2001, in the last three weeks before Ames' chapter 11 filing, Ames was not issuing any checks to its

---

[3]    *See* Spain Affidavit ¶ 6.

[4]    *See* Spain Affidavit ¶ 6; Hr'g Tr. at 101-02.

[5]    *See* Cotter Affidavit ¶ 3.

[6]    *Id*. at ¶ 4.

[7]    *Id*.

[8]    *See* de Aguiar Affidavit ¶ 7; Cotter Affidavit ¶ 5.

[9]    See Cotter Affidavit ¶ 5.

[10]   *See* Cotter Affidavit ¶ 5.

creditors pursuant to a general check run.  Instead, Ames issued checks only to pay invoices specifically selected out of the Oracle database and based upon specific requests.[11]

### C.     Creditor Pressure

Once the changes in the accounts payables system were implemented, Eugene Bankers, Ames' Senior Vice President of Marketing and Advertising, or one of his subordinates, repeatedly inquired with Cotter about the status of payments to Cellmark—seeking to ascertain whether payments to Cellmark were approved by the group and requesting that checks be issued to Cellmark.

During the preference Period, Cellmark did not contact or communicate to Bankers or anyone else at Ames about lack of payment on any of Cellmark's invoices, and Bankers did not tell anyone at Ames to the contrary.[12]  But Bankers communicated to others at Ames that if Ames did not send payment to Cellmark, Ames would not get the circular out, and would go out of business.[13]  Bankers told Cellmark CEO Joe Hoffman that he was "aggressive with [Ames'] finance department to make sure that checks sent were being sent on a continuity [sic] basis to them."[14]

At deposition nine months before trial, Dominick Merole, Cellmark's Vice President of Finance and Credit testified *that he could not remember anything* about Ames' financial condition in 2001.  But at trial he testified that *no one at Cellmark knew* of Ames' financial difficulty.  Merole thereafter recanted the statement, returning to the explanation he gave at deposition.  As Vice President of Finance, Merole received Ames' 2001 quarterly filings, and

---

[11]     *See* Cotter Affidavit ¶¶ 5, 11.

[12]     *See* Bankers Affidavit ¶ 9.

[13]     *See* Hr'g Tr. at 136, 142 ("[M]y information that I would have shared within Ames with the financial people was my belief that we would go out of business if we missed a circular but not any communication from Cellmark.").

[14]     *See* Hr'g Tr. at 145.

notifications from Credit Risk Monitor reporting events such as downgrades in credit rating.[15]

But Merole could not find the Ames customer file that would have contained those quarterly

filings and credit updates.  Though it may not be ultimately dispositive (since the Court does not

find that Cellark affirmatively placed pressure on Ames), the Court disbelieves Merole's

later-retracted statement that nobody at Cellmark knew of Ames' financial condition, and also

disbelieves his statement that he couldn't remember anything about it—in each case by reason of

information Merole received and Ames' importance as a customer.[16]

> D.   Extension of Credit

Cellmark's last invoice to Ames was dated July 17, 2001, weeks before the transfers at

issue and over one month before the Petition Date.[17]  During the three years before the

Preference Period, Cellmark issued invoices to Ames almost weekly, and there was no similar

34-day break in the issuance of invoices as there was between the last invoice and the Petition

Date.[18]

> E.   Industry Standard

Cellmark submitted the expert testimony of Hal Schaeffer, Jr., a professional preference

expert, to establish the ordinary business terms in Ames and Cellmark's industry.   Schaeffer

testified that ordinary terms in Cellmark's industry were "2% 10 net 30 days" ("**2% 10**"),

meaning that invoices would be due in 30 days but that a customer would be entitled to a

discount if it paid earlier.[19]  Schaeffer analysis assumed the existence of a discount of 2% 10

---

[15]   *See* Hr'g Tr. at 117-18.

[16]   This does not change the Court's factual finding, however, that nobody at Cellmark actually placed
pressure on Ames.

[17]   *See* Merole Affidavit, Ex. A.

[18]   *See* Merole Affidavit, Ex. A.

[19]   *See* Schaeffer Expert Analysis and Opinion at 5 ("**Schaeffer Report**"); Hr'g Tr. at 185.

because "[a] company will not take and pay faster than standard terms unless they are offered some sort of incentive" and because "[2% 10] is a fairly common term in many industries."[20] Nevertheless, Schaeffer admitted that Ames was not given such terms and discount in this case.[21]

Schaeffer provided evidence as to the time to pay in Cellmark's industry, and compared the timing of Ames' payments to that industry standard. His testimony was sufficient for the Court to assume, without deciding, that Ames' payment history was sufficiently consistent with the industry standard so as not to find this, by itself, sufficient to establish a preferential transfer. In light of other findings and legal conclusions in this Decision, the Court does not need to find any further facts in this area, and does not make additional findings.

   2.   *Transfers at Issue*

The original complaint against Cellmark sought to recover approximately $6.7 million in preferential transfers. In the Pre-Trial Order, Ames limited its claim for recovery to approximately $1.9 million[22]. Ames made three payments by check to Cellmark on account of four invoices in the two weeks before filing for bankruptcy:

>       (1) a check for $700,000.00 (the "**$700,000 Check**"), issued on August 6, 2001, that cleared on August 10, 2001;

>       (2) a check for $690,690.52 (the "**$691,000 Check**"), issued on August 9, 2001, that cleared on August 13, 2001; and

>       (3) a check for $764,918.81 (the "**$765,000 Check**"), issued on August 13, 2001, that cleared on August 15, 2001.[23]

---

[20]   *See* Hr'g Tr. at 185-86.

[21]   *See* Hr'g Tr. at 187.

[22]   The exact requested amount is $1,899.970.73.

[23]   Joint Pre-Trial Order, Stipulated Facts, ¶ 4.

As of the Petition Date, Ames did not owe Cellmark anything.[24]

### A. Payment on Account of Invoice 70

The first two checks, the $700,000 Check and the $691,000 Check, were made on account of Cellmark invoice #00070 dated July 3, 2001 ("**Invoice 70**"), a manually generated invoice for $1,390,690.52 which covered the paper used to publish the 2001 Home Book.[25]  Of the approximately 300 invoices Cellmark sent to Ames over a period of three years, only Invoice 70 was manually prepared.[26]

Invoice 70 differed from the 300 other invoices in other material respects as well.  For over two years, each invoice generated to Ames was issued in numerical sequence by Cellmark's Papersoft system,[27] bearing a five digit number beginning with the number "1."[28]  In the two years before the Petition Date, the first invoice for each Home Book order was issued in *late* July, with payment becoming due in late August.  However, Invoice 70 was issued at the *beginning* of July, with partial payments received on August 8 and 10, 2001, at least two weeks before payment in the previous two years.  Also, whereas all other invoices directed checks to be made payable to "Cellmark Paper, Inc.," Invoice 70 directed checks to be made payable to "Cellmark Paper USA."

To generate the two checks issued by Ames on account of Invoice 70, Cotter needed to manually override Ames' payment system.[29]  There were no such lump sum or partial payments

---

[24]     *See* Cotter Affidavit ¶ 14.

[25]     *See* Cotter Affidavit ¶ 10-11.

[26]     *Compare* Cellmark Ex. 1 *with* Spain Affidavit, Ex. A;  *See also* Hr'g Tr. 89-90.

[27]     *See* page 3 *supra*.

[28]     *See* Merole Affidavit, Ex. A.

[29]     *See* Cotter Affidavit ¶ 12.

made to Cellmark before the Preference Period.[30]  The two checks—the $700,000 Check and the $691,000 Check—were received 36 and 38 days, respectively, after the invoice date, outside of the 30 days permitted under Ames' financing terms.[31]

      B.    <u>Payment on Account of Invoices 15993 and 16131</u>

The third check at issue, the $765,000 Check, was paid in the week before the Petition Date, and was payment on account of three Cellmark invoices, two of which are at issue here.[32] Payment on account of two of those invoices—for invoice #16131 for $390,814.00, and invoice #15993 for $118,466.21—was received 28 and 29 days, respectively, after the invoice date. Both invoices carried 30 day terms.[33]  Cellmark offered no discount for early payment.[34]  During the year before the Preference Period, when the Oracle payables system was fully operational, Ames did not pay an invoice before term.[35]  To generate the third check, Ames needed to manually override the Oracle database protocols.[36]

<u>Discussion</u>

Preferential transfers, referred to colloquially as "preferences," are recoverable in civil actions under the Code because they run contrary to the goal of equality of treatment amongst

---

[30]    *See* Cotter Affidavit ¶ 12.

[31]    *See* Schaeffer Report, Ex. 2.

[32]    *See* Cotter Affidavit ¶ 13.

[33]    *Id.*

[34]    *See* Hr'g Tr. at 187.

[35]    *See* Cotter Affidavit ¶ 13.  The only evidence that has been presented to support the existence of early payments in the year before the Preference Period has been controverted by Ames.  Specifically, Cellmark argues that invoice #13107, which would have been issued during the time the Oracle system was in place, was paid in 18 days, but Ames' records show that the payment was made 33 days after the invoice date. The Court finds no reason to think that Ames' computer records, from which the pay stubs that establish the payment date were generated, were less accurate than Cellmark's computer records, from which the invoice reprints were generated.  Any early payments made before the year leading up to the Preference Period are irrelevant.  The Oracle system was not in place at that time, and Ames has raised sufficient doubt as to the accuracy of Cellmark's records in that regard such that the Court disregards Cellmark's table on page 29 of its post-trial reply brief.

[36]    *Id.*

creditors—one of the longest standing, and fundamental, principles of American bankruptcy law. It is not unlawful or otherwise improper to receive a preference, but when the requirements of the Code are satisfied, and no applicable defense is available, preferences must be returned to the estate, so they then may be made available for the entirety of the unsecured creditor community.

To establish the avoidability of a preferential transfer, section 547(b) of the Code requires the Debtor to demonstrate by a preponderance of the evidence that the transfer was:

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made [during the Preference Period]. . . ; and
>
> (5) . . . [enabled the creditor] to receive more than such creditor would receive [if the creditor received payment on the debt in a chapter 7 liquidation, rather than through the transfer]. . . .

The recipient of the preference may also defend against a preferential transfer claim by establishing one of the defenses listed in section 547(c) of the Code, two of which are colloquially referred to as the "new value" and "ordinary course" defenses.

In a preference action, the Debtor seeking to recover the preferential transfer has the burden of proving the avoidability of the transfer under section 547(b) of the Code, and once it does so, the party against whom recovery or avoidance is sought has the burden of proving that a preference exception applies under section 547(c) of the Code.[37]  Here the parties have stipulated that the first, second, fourth and fifth of the above-listed requirements are satisfied.

---

[37]   *See* 11 U.S.C. § 547(g) ("For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against

Cellmark defends this action by challenging insolvency (the third of the requirements listed above), and by alleging that the payments were received in the ordinary course. However, the Court finds, as facts or mixed questions of fact and law, the requisite insolvency and that the payments cannot be deemed to have been made in the ordinary course.

*1. Insolvency*

The definition of "insolvent" appears in section 101(32) of the Code, as the Code reads now and as it read in 2001, when the Debtors' chapter 11 case was filed. With exceptions and carveouts not applicable here, Code section 101(32) defines the term "insolvent," in the context of a corporate business debtor, to mean "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation…."

Under section 547(f) of the Code, the debtor is presumed to have been insolvent on and for the 90 days preceding the bankruptcy filing. That presumption is rebuttable, but rebutting the presumption requires evidence. Here Cellmark has that burden of proof.[38]

As the statutory definition of insolvency makes clear, establishing solvency requires evidence of the value of Ames' assets and liabilities (and especially the former) at *a fair market value*.[39] Cellmark relies, for this purpose, on Ames books and records as of the time of its filing. But like so many financial statements published by corporate debtors, Ames' financial statements were historic, based principally on acquisition cost and any applicable depreciation. Financial statements' showings as to assets and liabilities (and especially assets) are not

---

whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.").

[38]   *See In re Candor Diamond Corp.*, 68 B.R. 588, 592 (Bankr. S.D.N.Y. 1986).

[39]   *See* 11 U.S.C. section 101(32)(A); *See also Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 35-36 (2d Cir. 1996) ("Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.") ("***Roblin***").

necessarily (and rarely are) reflective of actual fair market value, especially in industries where assets need not be "marked to market."  The schedules of assets and liabilities filed by Ames at the outset of its chapter 11 case clearly stated that they listed merely the *book value* of Ames' assets and liabilities, and that Ames could not obtain "current market valuations."[40]  Evidence of the book value of assets is insufficient to rebut the presumption of insolvency.[41]

Cellmark's assertions that omissions in Ames' financial statements support Ames' solvency are without merit.  Cellmark misses the point that Ames' statements do not include $200 million of bond debt that Ames guaranteed to its corporate parent.  But apart from that, Cellmark's reliance only on statements of assets and liabilities was insufficient to rebut the presumption of insolvency.[42]  Cellmark offered no evidence of the fair market value of Ames' merchandise inventory, or other, less valuable, assets.  Because the Court finds that Ames' financials by definition do not represent the fair market value of Ames' assets and liabilities, and Cellmark has not offered any additional evidence of Ames' assets and liabilities, the presumption of insolvency has not been rebutted, and the Debtors have established insolvency under section 547(b)(3) of the Code.

---

[40]   *See* Cellmark Ex. 6, page 4, General Notes Regarding the Schedules, note 1.

[41]   *See In re Enron Corp.*, Adv. Pro. No. 02-3119, Memorandum Decision Regarding Plaintiffs' Motion for Partial Summary Judgment at p. 11 (Bankr. S.D.N.Y. October 28, 2004) (Gonzalez, C.J.) ("When valuation evidence is based primarily on the assets' book value, it does not rebut the Bankruptcy Code section 547(f) presumption of the debtor's insolvency" (typographical errors corrected)) (citing *In re Lids Corp.*, 281 B.R. 535, 542 (Bankr. D. Del. 2002)).

[42]   The only cases Cellmark cites to support that a debtor's schedules alone may rebut the presumption of insolvency do not actually reach that conclusion.  In *In re Sierra Steel, Inc.*, 96 B.R. 275, 277 (9th Cir. B.A.P. 1989), the bankruptcy appellate panel was unable to determine whether the bankruptcy court's finding was erroneous because it lacked a trial transcript.  In *In re Tennessee Chemical Co.*, 143 B.R. 468, 472 (Bankr. E.D. Tenn. 1992), the court ruled that it did not need to decide whether the schedules rebutted the presumption if the trustee proved insolvency anyway.

*2. Ordinary Course*

To prevail on the ordinary course of business defense, in this pre-2005 chapter 11 case,
Cellmark needs to establish that the debt was incurred by Ames in the ordinary course of its
business (a matter not in dispute here), and, more importantly, under the facts here, that the
transfers were (1) made in the ordinary course of Ames' and Cellmark's business and (2) made
according to ordinary business terms.[43]   Courts "have repeatedly held" that the ordinary course
of business defense should be narrowly construed.[44]   Courts in this district look to a variety of
factors to determine whether transfers were made in the ordinary course of the parties' business,
including the prior course of dealings of the parties, the amount of the payment, the manner of
payment, and whether the payment was the result of any actions by the creditor or favoritism by
the debtor.[45]   As the Second Circuit has observed, quoting the House Report, the purpose of the
ordinary course of defense is "to leave undisturbed normal financial relations, because it does not
detract from the general policy of the preference section to discourage unusual action by either
the debtor or [its] creditors during the debtor's slide into bankruptcy."[46]

The baseline of 300 invoices and payments between Ames and Cellmark revealed that
prior to the Preference Period, Ames paid Cellmark invoices in full and shortly after the due date.
In the entire relationship with Cellmark, there were no instances where Ames made partial
payment on an invoice; no instances where Ames issued a lump sum check; no instances where

---

[43]      See 11 U.S.C. § 547(c)(2).  Section 547(c)(2) of the Code was amended by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005 (**"BAPCPA"**).  Since the amendments only apply to
cases filed after October 17, 2005, and the Debtors filed for bankruptcy in 2001, the pre-BAPCPA version
of section 547(c)(2) applies.  Cellmark must establish that the original debt was incurred in the ordinary
course of business, the transfers were made in the ordinary course of Ames and Cellmark's business, and
made according to ordinary business terms.

[44]      *See In re CIS Corp.*, 214 B.R. 108, 119 (Bankr. S.D.N.Y. 1997) (Beatty, J.).

[45]      *See, e.g.*, *In re 360networks (USA) Inc.*, 338 B.R. 194, 210 (Bankr. S.D.N.Y. 2005) (Gropper, J.).

[46]      *Roblin*, 78 F.3d  at 41.

Ames paid a manually generated invoice; and no instances in the year before the Preference
Period that Ames paid an invoice early.  In each of these respects, the payments to Cellmark at
issue here were different.

Making payments in response to creditor pressure can often be indicative of transactions
out of the ordinary course.  But the absence of such creditor pressure, while of course failing to
support an out of the ordinary course finding for that reason, does not otherwise establish the
opposite.  Cellmark observes that here the payments at issue were not made in response to any
communications or pressure from Cellmark, and argues that this means that the payments were
made in the ordinary course of business between Ames and Cellmark.  The Court cannot agree.
Even in the absence of creditor pressure, other facts support the conclusion that payments on
account of Invoice 70 were not made in the ordinary course of business.

First, Invoice 70 was out-of-sequence and manually prepared.  A manually prepared
invoice was unprecedented in the three-year relationship between Ames and Cellmark.  Also,
whereas all other invoice numbers were issued in a numerical sequence beginning with the
number "1", Invoice 70 bore the number 00070.[47]

Explanations offered by Cellmark employees as to the uniqueness of Invoice 70 are
unpersuasive.  Dominick Merole, Cellmark's credit manager, testified at his October 2008
deposition that he did not know who prepared Invoice 70, why there was a "000" code in front of
the number, or why the check was made payable to an entity different from the one to be paid on
any other invoice.  At trial, Merole submitted an affidavit with three paragraphs of testimony

---

[47]    The additional manual invoices supplied by Cellmark, invoices labeled as "fake," do not relate to the pre-
Preference Period or Preference Period, and therefore the Court does not find them relevant to the
determination of whether the first such manually prepared invoice, and the only one during the pre-
preference and Preference Periods, was made in the ordinary course.  Also, the additional "fake" invoices
supplied by Cellmark in its post-trial briefing, are in correct numerical sequence and have analogues in
Cellmark's computer, making them otherwise distinguishable—and less unordinary—than Invoice 70.

explaining that the invoice was manually prepared because Ames requested one invoice per

order, and Papersoft would create two invoices when, as was the case with the Home Book

order, Cellmark needed paper from two suppliers to fulfill that single Ames order.[48]  On cross-

examination, Merole testified that he learned what he knew about Invoice 70 when he reviewed

all Preference Period documents before the October 2008 deposition.  Merole's inability to

explain what caused him to recall those facts in his affidavit but not at his earlier deposition

discredits his testimony.[49]

Trevor Spain, one of Cellmark's sales representatives, gave the same reasons as Merole

did for the manual preparation of Invoice 70.[50]  However, these reasons are not credible, since

for each of the 1999 and 2000 Home Book orders and the 1999 and 2000 Toy Book orders—two

of the largest orders by paper volume and dollar amount—Cellmark sent multiple invoices to

Ames for each order.[51]  In all four circumstances, Cellmark created the invoices with its

computerized invoicing system, Papersoft, rather than manually.  Cellmark also billed Ames

with multiple invoices per purchase order over 70 times in three years.

Second, Invoice 70 was paid in two partial payments.  While a split payment is not

necessarily outside of the ordinary course, it may be atypical for the parties.  Here it was the first

time that a split payment had been made in Cellmark and Ames' relationship.

Third, Invoice 70 was sent out earlier than corresponding Home Book invoices from the

previous two years.  Invoice 70's due date was August 2, 2001, which is about three weeks

---

[48]     *See* Merole Affidavit ¶ 13-15.

[49]     *See* Hr'g Tr. at 104-05.

[50]     Spain testified that Invoice 70 was manually prepared because Ames demanded that it receive only one
invoice in response to each Ames purchase order and that Invoice 70 was prepared manually because the
computer system would prepare multiple invoices when, as was the case with the Home Book order, the
paper came from two of Cellmark's suppliers.  *See* Hr'g Tr. at 50.

[51]     *See* Hr'g Tr. at 65, 70-71, 76-78.

earlier than payment on account of a Home Book invoice had been due in the two years before the Preference Period.

While the absence of creditor pressure is one factor, the other factors—the lump sum or partial payments, the manual preparation of the invoice, and the fact that the invoice was out of sequence, are other factors that outweigh the single factor on which Cellmark bases its entire ordinary course of business defense. No credible explanation has been provided for the manual preparation, partial payment on account of, and out of sequence nature of Invoice 70.

Cellmark's reliance on the fact that Cellmark had not commenced collection efforts with respect to Invoice 70 is not dispositive of the issue. Cellmark cites *In re Vogel Van & Storage*[52], which held that it is proper to consider whether the creditor's unusual conduct was related to the challenged transfer. The manual preparation of Invoice 70 a couple of weeks earlier than the same invoice in prior years leads the Court to conclude that the invoice was manually prepared for the purpose of getting payment from Ames earlier than it had been received in the past. That, coupled with the close proximity of the payment to the Petition Date, supports the conclusion that the invoice was created and sent out to prevent the situation where payment would have been due after the Petition Date.

The fourth and fifth factors are most significant to the Court—Ames' practice of identifying the favored creditors who would be paid in the period of its tightening liquidity (while others would not be), and Bankers' views as to the importance of paying Cellmark, above others, because of Ames' marketing needs. Though there is no evidence of Cellmark directly communicating with Ames and coercing Ames to make an earlier payment, Ames understood, based on Bankers' comments, that payment to Cellmark was necessary to keep the business

---

[52]   210 B.R. 27, 36-37 (N.D.N.Y. 1997).

going.  Cellmark, in turn, had less reason to reach out to Ames directly to push for payment on

account of outstanding invoices, since it received assurance from Bankers that he was making

such efforts—effectively on Cellmark's behalf.

This is not to say that either Cellmark or Bankers acted wrongfully in this regard.  It is

merely to say that the payments to Cellmark at this time were no longer ordinary, and cannot be

found to have been in the ordinary course.  Therefore, while the timing of the payments on

account of Invoice 70 was within the ordinary range for the parties—29 to 43 days—by

statistical analysis, and the payments were not made in response to direct efforts of coercion by

the creditor, they nevertheless cannot be found to be within the ordinary course.

Similarly, in material respects, the third payment—the $765,000 Check on account of

invoices #15993 and #16131—was made before the payment was due.  Cellmark offered no

discount for early payment.  The early payment of two invoices was without any incentive to do

so, and when that had never been done in the year before the Preference Period.  Ames'

computer system would have ordinarily not cut the check until the pay date, and an override of

the system was necessary to make these payments.  Also, of course, the third payment was made

in the same context of the first two payments—Ames' perception that Cellmark, above other

creditors, had to be paid to achieve critical marketing needs.

Thus the Court finds, as mixed question of fact and law, that the transfers were not in the

ordinary course, and that Cellmark has failed to establish this defense.[53]

*3.  Prejudgment Interest*

As the Court noted in its 2010 decision in connection with an Ames preference action

against Unical Enterprises,[54] a grant of prejudgment interest is discretionary, but it has been held

---

[53]    Thus the Court does not need to discuss Cellmark's satisfaction of the separate requirement of industry
typicality.  As noted above, the Court assumes, without deciding, that Cellmark's showing in this regard
was sufficient.

in this district that absent a sound reason to deny it, it should be awarded.[55]  The Second Circuit has ruled that in exercising its discretion as to whether or not to award prejudgment interest, the court should take into consideration: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."[56]  This Court applied these principles in *Ames-Unical,* which, like this case, was a preference action.

As in *Ames-Unical*, several of the above-listed considerations tend to weigh in favor of awarding prejudgment interest in accordance with the general rule.  Ames has been denied the funds that went out to defendant Cellmark for many years, and, in the early years of this case, needed to borrow money under its DIP financing facility; it is only fair to compensate Ames, at least to some extent, for the incremental interest expense it thereby had to incur.  And the remedial purpose of the statute is to recover funds from favored creditors for the benefit of the creditor community generally, and it is unfair for the remainder of the creditor community to subsidize a losing preference defendant by providing what is in essence an interest-free loan.

But also as in *Ames-Unical*, it is necessary for this or any court to take into account the particular equities of the specific case before it.  One of those relative equities is the fact that the progress of this case was stalled for a period of time by reason of the inaction of Ames' predecessor counsel, for which the Court believes it unfair to penalize Cellmark.

---

[54]  *See Ames Merchandising Corp. v. Unical Enterprises, Inc. (In re Ames Department Stores, Inc.)*, 2010 Bankr. LEXIS 5115, 2010 WL 6052849 (Bankr. S.D.N.Y. Sept. 10, 2010) ("***Ames-Unical***").

[55]  *See In re Teligent, Inc.,* 380 B.R. 324, 344 (Bankr. S.D.N.Y. 2008) (Bernstein, C.J.) (citing *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d 568, 579-80 (3d Cir. 2007)). *See also In re Milwaukee Cheese Wis., Inc.,* 112 F.3d 845, 849 (7th Cir. 1997).

[56]  *Jones v. UNUM Life Ins. Co*., 223 F.3d 130, 139 (2d Cir. 2000).

Another of the relative equities, as this Court explained in *Ames-Unical*, is the extent to which the defendant acted innocently and had no reason to know of the wrongfulness of its actions, or where there is a good faith dispute between the parties as to the existence of any liability.[57]   Much earlier, in the 1929 case of *St. Louis & O'Fallon Ry. Co. v. United States*[58] (which was cited by the Second Circuit in *Wickham Contracting*), in the context of determining the existence of a good faith dispute, the Supreme Court focused on whether there was "bona fide denial" under circumstances "sufficient to justify a contest."

Here the evidence established that Cellmark did not pressure Ames to make special payment.  If it were otherwise, Cellmark would of course be on notice of that fact, and its notice would defeat bona fide denial.  But here that particular basis for finding Cellmark to be liable for prejudgment interest is lacking.  Rather, in this case the Court found Cellmark to be liable on these preference payments in material part by reason of a combination of factors, including Cellmark's special invoicing, Ames' "bucket procedure," and Ames' own view that it had to give Cellmark favored treatment.

But the Court does not have evidence as to when Cellmark was put on notice of the overall strength of the case against it, except insofar as the Court can draw that inference from the time of submission of the pretrial order.  By analogy to the way this Court dealt with the similar issues in *Ames-Unical*, this Court believes that the "clock" on prejudgment interest should be deemed to have begun to run only from the time of submission of the pretrial order.

For the foregoing reasons, Cellmark is to pay Ames prejudgment interest on the amounts that must be returned, but only for the period from the time of submission of the pretrial order to

---

[57]   *See Wickham Contracting Co. v. Local Union 3*, 955 F.2d 831, 834-35 (2d Cir. 1992) ('**Wickham Contracting**").

[58]   279 U.S. 461, 483 (1929) ("**St. Louis & O'Fallon Railway**").

its payment of the amount found to be preferential at trial.  For the reasons explained at greater

length in *Ames-Unical*, interest is to be calculated using the weekly average 1-year constant

maturity Treasury yield in accordance with 28 U.S.C. § 1961, as adapted to apply to an award of

pre-, as contrasted to post-, judgment interest.

<u>Conclusion</u>

The Court determines that each of the three Ames payments in question was made while

Ames was insolvent, and finds the ordinary course defense to be inapplicable.  Pursuant to Fed.

R. Civ. P. 58 (made applicable to this adversary proceeding by Fed. R. Bankr. P. 7058), Ames is

to settle a standalone judgment for a monetary award corresponding in amount to the return of

the three payments in question, together with prejudgment interest to the extent, but only the

extent, authorized in this Decision.  The time to appeal will run from the time of entry of

judgment, and not from the date of this Decision.

Dated: New York, New York          <u>  *s/Robert E. Gerber*    </u>
      March <u>**28**</u>, 2011          United States Bankruptcy Judge